THE ERIE RAILWAY COMPANY *vs.* THE DELAWARE, LACKA-WANNA AND WESTERN, AND THE MORRIS AND ESSEX RAILROAD COMPANIES.

1. Where two railroad companies have the authority to build and run a railroad between the same termini, neither can take exception to any irregularity or unlawfulness in the exercise of such franchise by the other, unless it can show a particular injury to itself from such course.

2. Where a party stands by and encourages another in the construction of a public work, at great cost, this court will not interfere with it at his instance. Such conduct estops him from calling in question the legality of the structure.

3. Where a railroad company appropriated land under a belief that they were the owners of it, and the land appeared to be of no particular value

Erie R. Co. *v.* Del., Lack. & Western, and Morris & Essex R. Cos.

to the owners, this court, in the exercise of its discretion, refused to restrain them from its enjoyment.

*Quære.* Whether this court will prevent, by injunction, the permanent appropriation of lands by a railroad company acting *ultra vires*, in the absence of irreparable injury.

4. Where a railroad company have irregularly taken lands, but have the capacity to acquire title, this court will not, where the advantage to the complainants would be small, and the injury to the company incalculably great, interpose and stop the running of the cars on such road until the statutory method of acquiring title can be executed.

5. When the title to the lands the use of which the complainants seek to enjoin is in dispute, this court has no jurisdiction. In such case, an injunction is never granted to prevent the enjoyment of the property in dispute by either party who happens to be in possession of it.

6. A court of equity will never lend its active aid to a party who, by a superior knowledge and artful silence, has gained an unfair advantage over another.

This cause was argued upon bill and answer, before Beasley, Chief Justice, sitting for the Chancellor.

*Mr. E. T. Green, Mr. J. P. Stockton,* and *Mr. Gilchrist,* Attorney-General, for complainants.

*Mr. Vanatta, Mr. C. Parker,* and *Mr. Williamson,* for defendants.

THE CHIEF JUSTICE.

The argument in this case occupied a week, but learned as it was, it has failed to satisfy me that there is any difficulty, either in ascertaining the legal principles pertinent to the controversy, or in making the proper application of those principles. The facts of the case, so far as relates to the present motion, are briefly these:

The complainants are the Erie Railway Company. The bill sets forth the title of this corporation to a railroad from the city of Paterson to the city of Hoboken, in this state, and that it has been for some time past in the peaceable occupation and use of such road. I shall assume for present purposes, that this title is properly pleaded, and that the

complainants are lawfully invested with the franchise claimed.

It further appears, that the road in question runs through a tunnel which has been cut through Bergen Hill, in Hudson county, near Hoboken. In this tunnel two railway tracks are laid, each adapted to cars of a wide or narrow gauge. The complaint is, that the Morris and Essex Railroad Company, or their lessees, the Delaware, Lackawanna and Western Railroad Company, have built, without authority of law, a branch railroad, which is called in the pleadings the Boonton branch, and which, running through Paterson to Hoboken, forms a competing line between those cities with the road of the complainants. The bill also complains that this branch road has been laid over a certain tract of land, the property of a certain corporation styled the Long Dock Company, of which the complainants are the lessees, without the defendants having acquired any title to, or interest in such land. The complainants further show, that the defendants have recently constructed wide gauge tracks over this Boonton branch, and that they attempted to connect, by force, these tracks with the broad gauge tracks of the complainants at the Bergen tunnel.

Upon the filing of this bill, a temporary injunction was granted, restraining the defendants from making this connection, and upon the present occasion the endeavor is to continue that injunction.

To this bill the defendants have put in an answer of great length, setting up their right to build this Boonton branch by force of several successive legislative acts. They likewise show that the Bergen tunnel was built by and upon the land of the Long Dock Company, with the consent of the New York and Erie Railroad Company, who were the predecessors of the complainants, and that said Long Dock Company granted to the Hoboken Land and Improvement Company, and their assigns, the right to the use of the tunnel, without paying toll for such privilege, for a certain period of time not yet elapsed. That this Long Dock Com-

pany were the owners of lands lying to the west and east of
such tunnel, and that they also granted to the Land and
Improvement Company and their assigns, a right of way for
a railroad with two tracks over such lands. These rights,
it is shown, have passed by assignments to the defendants,
the Delaware, Lackawanna and Western Railroad Company.
As to the complaint of having laid the Boonton branch in
part over lands of the complainants, the reply is, that the
defendants purchased such land of the Long Dock Company
with the assent of the complainants; and that if the convey-
ance thus obtained does not embrace such land, the omission
was occasioned by the fraud of the complainants.

This is the general scope of the allegations of the parties,
and the foregoing statement will, I think, be sufficient, in
connection with such other facts as may be incidentally
noticed, to make intelligible the views which I am about to
express upon the case in its present aspects.

It thus appears that the first wrong of which complaint
is made is, that the exclusive franchise of the complainants
of possessing a railroad and carrying goods and passengers
thereon from Paterson to Hoboken, has been infringed by
the defendants. The claim is, that the complainants have
a grant from the legislature to construct and run a railroad
between these termini, and that the defendants have no such
authority, but have established a road between these cities,
by a perversion and in fraud of the statutable powers con-
ferred upon them. If affairs were purely in this condition
the position would be well taken. In the case of the *Raritan
and Delaware. Bay Railroad Co. and others* v. *The Dela-
ware and Raritan Canal, &c.,* 3 *C. E. Green* 546, it was
decided by the Court of Errors in this state, that the right
to build and use a railroad for the public use is a franchise,
the right to which can be derived from the state only, and
that such franchise is exclusive except against the govern-
ment, and that a competing road made without legislative
authority will be enjoined. I have assumed that the com-
plainants are the lawful possessors of such a franchise, and,

consequently, against such claimants the defendants are bound to show a right, either legal or equitable. They have attempted to do both. The legal right which is thus adduced, consists in sundry legislative grants contained in the charter of the Morris and Essex Railroad Company, and in the supplements to such charter. But I shall not at present undertake to construe these various and somewhat obscure statutes, for I do not find it necessary from any present exigency, to pass definitely on the legal title thus asserted by the defendants. I may say, however, that I do not consider it at all clear, that even resting the argument on the grounds of strict law only, the complainants would be entitled to prevail on this point. It is true, that I am far from being convinced that the defendants had the right to run their branch road in the way in which they have done, directly to the city of Paterson, instead of passing aside of that place, through the Great Notch, which is the statutory point called for in the supplement to the charter which is relied on in this respect. I think the legal propriety of this act is dubious. But still, even admitting this to be a deflection from the line prescribed, if the defendants are right in their claim, that if they had run through the Great Notch, on the course indicated in the statute, they could lawfully have gone to a point in a straight line extending from Paterson to Hoboken, and thence to the city of Hoboken, and then could have connected the road so formed with the city of Paterson by a spur, I think it quite obvious the complainants cannot object to the road at present established. This results from the fact that the deviation to Paterson, as it now exists, would not in such a condition of things, even if unauthorized, injuriously affect the complainants. The substantial question on this head between these parties must be, whether each has the authority to build and run a road between these points, for if each has such authority, neither can take exception to any irregularity or unlawfulness in the exercise of such franchise, unless it can show a particular injury to itself from such course. But, as I have before

remarked, no final opinion touching the legal title of the defendants to construct their line of railroad will be expressed at. this stage of the cause. It is proper, however, to observe, as the consideration has an important bearing on the topic on which I am next to enter, that this claim of a lawful title by the defendants has at least too much of substance in it to leave them exposed to the suspicion that they have, with.their eyes open, acted in fraud of their charter, or have willfully trespassed on the rights of the complainants. The attempt was made to give such an unfavorable color to their conduct in this particular, from the circumstance that in the year 1869 a bill was discarded by the legislature, which contained express authority to build. the branch in question as it has been built; but I think a fair interpretation of that transaction is, that the defendants, from motives of prudence, endeavored to procure this statute, in order to remove all uncertainty as to the extent of their power. Such an effort is not at all inconsistent with entire good faith and an honest conviction that they were possessed of the legal ability to lay the road in question. They allege that in this affair they acted with caution and upon the advice of legal counsel, and there is no circumstance which throws any suspicion over this assertion. However infirm, then, their legal title may be, I do not perceive anything in this act of the defendants, which ought to impair, in any degree, their standing in a court of equity.

My reason for thus postponing all ultimate consideration of the legal status of this branch road of the defendants, is because, on the concession even of its unlawfulness, I do not think the complainants are in a position to challenge such status before this court. In my opinion, the complainants have lost this right by their own acquiescence and laches. Indeed, when the pleadings were first read, I thought I perceived that the *locus standi* of the complainants on this point was missing, and I listened with attention for some suggestion or explanation of counsel, but no circumstance was pointed out supplying this insufficiency in the case made

by the bill. The defect seems to me fundamental. I know of no principle of equity better settled than the rule applicable to this matter, nor does it seem possible for any facts to be more obviously within the reach of such principles. The case is this: the complainants claim the exclusive right to a railroad between the cities of Paterson and Hoboken; they stood by and saw the defendants build, within sight of their own road, a rival parallel road this whole distance, at a cost of many millions of dollars; they expressed no dissent and gave no warning; and finally they sold, for a large sum of money, a part of their own land to help the construction of this road, which, it is now claimed, has no rightful basis whatever. In my estimation, these facts are amply sufficient to debar the complainants from ever calling in question the lawfulness of this structure, which has been erected, not only through the passiveness of the complainants, but by their active assistance. This is not one of those cases in which it is lawful for a party to wait to see if a nuisance will work a special injury to himself or his property. At no time from the commencement of the work could its effect have appeared uncertain to the complainants; the course of the road was clear and avowed; the survey was on file; and the building of every foot of the structure, if unauthorized, was an invasion of the franchise of the complainants. If the complainants intended to contest the right of the defendants, why was not prompt action taken before this enormous outlay was made? Fair dealing and good conscience obviously required the complainants to assert their right at the outset, if it was designed ever to do so. By this course they could have secured themselves in all their privileges without inflicting any irreparable loss on the defendants. No excuse seems to exist, nor has any reasonable explanation been given, for this delay. From the conduct of the complainants, the defendants could fairly infer that there was no intention to object to the course they were pursuing, and after action has been based on this fair presumption, and great expense has been incurred, it is altogether too late

for opposition to be tolerated from the party so having acquiesced and encouraged. This is an equitable rule, which is applied in a great variety of cases, and indeed in every instance in which a complainant is seeking to enforce a stale equity. Laches and neglect are invariably discountenanced in this court, it being the common maxim that nothing will put its powers in action but conscience, good faith, and reasonable diligence. The rule is an ancient one, (see the case of the *Watercourse*, 3 *Eq. Cases, abridged,* 522, *pl.* 3,) and has been enforced in a large number of adjudications. As an example of the clear exposition and correct application of this doctrine, I refer to the case of the *Rochdale Canal Company* v. *King*, 16 *Beav.* 630. By a Canal Act, mill owners were empowered to use the canal water for condensing steam. The defendant applied to the company for leave to take water for generating as well as condensing steam. The company neither assented to nor refused the application, but the pipes were laid in the presence of their engineers. The mill being built on the principle of using the canal for both purposes, the Court of Chancery, although the plaintiff's rights had been established at law, held that they were bound by their acquiescence, and refused a perpetual injunction from taking water for the purpose of generating steam. The equitable rule was thus stated by Sir Samuel Romilly, Master of the Rolls : " The principle on which the defendants rely is often recognized by this court, namely, that if one man stand by and encourage another, though but passively, to lay out money, under an erroneous opinion of title, or under the obvious expectation that no obstacle will afterwards be interposed in the way of his enjoyment, the court will not permit any subsequent interference with it by him who formerly promoted and encouraged those acts of which he now either complains or seeks to obtain the advantage."

I have already said that the complainants encouraged the building of the road in question, both actively and passively, and the consequence is, that the rule above cited applies to

them with full force. That this principle is completely established in this court and is constantly enforced, will appear from the following cases. *Dann* v. *Spurrier*, 7 *Ves.* 231; *Powell* v. *Thomas*, 6 *Hare* 300; *Greenhalgh* v. *Manchester Railway*, 3 *My. & Cr.* 784; *Norway* v. *Rowe*, 19 *Ves.* 144; *Hart* v. *Clarke*, 6 *De G. M. & G.* 232; *Harryman* v. *Collins*, 18 *Beav.* 11; *Williams* v. *Earl of Jersey*, 1 *Cr. & Ph.* 91.

From the application of this equitable rule to the case before me, the result is, that I must hold that the branch road of the defendants, called the Boonton branch, is, as it respects the complainants, a legal structure, and this without any reference to the question whether or not it conforms to the power conferred upon the defendants or their assignors, by the legislature.

The claim for an injunction, therefore, cannot rest on this ground.

But, on the argument, a second ground for an injunction was pressed, which was that certain land of the complainants had been unlawfully taken by the defendants, and was being used for the purposes of this branch road.

The land referred to is a small strip, about twenty or thirty feet wide, lying along the main track of the defendants at the point at which the Boonton branch seeks its junction with such main track. The defendants have laid both their broad and narrow gauge tracks over this strip of land, and have thus connected their branch road with their main track at a point about thirteen hundred feet west of the Bergen tunnel.

It appears from the undisputed testimony in the case, that the defendants have had for some time past, this piece of land in their possession, and have been and now are running their cars over it, on the track with the narrow gauge. It was not pretended on the argument, nor is there the faintest color for such a pretence, that in taking possession of this land the defendants were aware that they were infringing the rights of the complainants. They supposed

that they were the owners of the land; so that if the case be taken most strongly against them, they must be regarded as having appropriated it under a misconception of their right; they are not willful trespassers. And the question thence arises, whether, under these circumstances, this court should, in the exercise of its discretion, restrain them from the enjoyment of this property. The ordinary rule is, that a mere trespass upon real estate does not give jurisdiction to this court, but, in order to have that effect the trespass complained of must be attended with some irremediable mischief. The modern English doctrine, however, appears to be, that a court of equity will not permit the permanent appropriation of lands by a railroad company acting *ultra vires*, but will prevent such appropriation by the use of its prerogative writ. From the cases heretofore decided in this state, it is not entirely clear that the preventive power of this court has so wide a scope.

But waiving this question, and assuming the English rule to subsist here in full force, I have yet failed to see the propriety of extending to the complainants, on this ground, the relief which is asked. The case does not show that the land which has been taken is of any peculiar value, and from its location it seems unfit for convenient use except by the defendants.

I have already concluded that the right of the defendants to this Boonton branch is not to be controverted; and the consequence is, they have the capacity, if they have at present no title to these premises, to proceed and acquire such title under the provisions in their charter. Under these circumstances, I should regard it as a most arbitrary and improvident exercise of the prerogative of this court, to interpose and stop the running of the cars on this great thoroughfare, until the statutory method of acquiring title to this land could be executed. From such a step the advantage to the complainants would be slight, but the injury to the defendants incalculably great.

If the defendants have no title, all that the complainants

can ultimately recover is an equivalent in money for this land, and this can be readily realized by an action at law, which would compel the defendants to acquire title by a condemnation of the property. There is, therefore, no imperative demand for the intervention of this court; at all events, the disproportion between the benefit to the complainants and the injury to the defendants, which would follow from granting an injunction, is so great as to forbid, in a very strong manner, the exercise of such an authority, and more particularly at this initial stage of the proceedings. Even if it had appeared that the land had been taken willfully and against the known rights of the complainants, I should still have hesitated long on account of the unnecessary waste of property that would ensue, before applying, in the present condition of things, this summary remedy. I have not been pointed to any precedent which would appear to justify, in the most distant degree, the course I am asked in this case to take, and I should be surprised to find that any such precedent existed. If, therefore, the title of the complainants to this land in question had appeared to be uncontested, I still should have been compelled to refuse an injunction founded on the unlawful appropriation of it by the defendants; but, as the proofs before me show, the fact is that the title of the complainants to this land is not uncontested. The defendants themselves claim title to it; and they allege the existence of the following facts: that this piece of land was the property of the Long Dock Company, and was part of a large tract over which they, the defendants, claim to have a right of way for a railroad with a double track. The extent of this easement with regard to the width of the strip of land which it embraces, has never been defined; and the defendants claim that it comprises within its bounds the small tract in controversy. This is denied by the complainants. Recent letters of the president of the Erie Company, show very conclusively, that the territorial bounds of this easement, claimed by the defendants, have never been ascertained. The case also shows

that the defendants have, for some years past, been in the peaceable occupation of a part of the very tract in dispute, and that they have used other parts of the larger tract for one of their bridges, to an extent which is unwarranted, unless their legal rights in the premises are co-extensive with their present claim. From these facts, it certainly appears that the title on which the complainants rest their application for an injunction is fairly in dispute, and that fact alone is sufficient to oust this court of its jurisdiction over this branch of the case. Under such circumstances, an injunction is never granted to prevent the enjoyment of the property in dispute, by either party who happens to be in possession of it. A disputed title is not a proper ground for an injunction.

But there is also a third objection to the complainants' application, founded upon the supposed ownership of this property, which, I think, is equally fatal to it. There are certain circumstances connected with the defendants' possession of the premises in question, which must operate in the nature of an equitable estoppel to prevent the complainants from treating them as trespassers. The circumstances referred to are the following :

It is admitted in the case, that the defendants have a conveyance for the land contiguous to the small tract in dispute. In this deed the Long Dock Company are the grantors, but the real and beneficial actors in the transaction were the complainants. When the defendants took that conveyance, they did so under the belief that it conveyed to them the land up to the line of the strip of land they were theretofore in possession of and were using for their main tracks. The purpose for which this conveyance was obtained, and the circumstances attending the transaction, are thus stated in the affidavit of Mr. Brisbin, a witness on the part of the defendants : "That he had the entire charge and control of purchasing the right of way for the Boonton branch of the Morris and Essex Railroad; that he applied to Jay Gould, president of the Erie Railway Company, who was also

president of the Long Dock Company, to purchase the right of way for said branch railroad over the lands of the said Long Dock Company; that he stated to Mr. Gould, that the purpose and object for which he desired to purchase said lands was for the construction of said branch railroad, and he then had some conversation with him as to the price. He (Mr. Gould) requested deponent to go with Mr. Rucker, general superintendent of the Erie Railway, and show him what lands were required, the situation and location of the same, and in pursuance of such desire deponent went upon the ground with Mr. Rucker, and pointed out to him the line of said branch railroad, as there staked out and since constructed upon the ground (which, in the complaint filed in this case, it is alleged the defendants have not title to); that Mr. Rucker and deponent also viewed the place where it was intended to connect, and where the said branch road has since been connected with the main line of the Morris and Essex Railroad, and it was then and there distinctly understood that the object, purpose, and desire, and the only object, purpose, and desire of the Morris and Essex Railroad Company in making the purchase of said land, was for the purpose of constructing said branch railroad and connecting the same with the main line of the Morris and Essex Railroad at the point where it has since been connected." Now it seems to me, if the facts are to be taken as proved, a clear defence on this point is established. The affidavit shows that the defendants, through their agent, pointed out to the agent of the complainants how the tract of land to be conveyed bounded on their land on which was located their main track, and informed him that they desired to make the purchase by reason of such contiguity. The agent of the complainants, by his silence, assented to the truth of the statement as to the location of the respective tracts and as to the fact of their contiguity, and the land was conveyed with that understanding. The defendants then entered and built their works. No one would venture to pretend, that by the force of these facts,

the defendants could be treated as wrong doers; and I am by no means prepared to say, that after the defendants have changed their situation, by making this purchase and by the construction of their road, on the faith of these facts mutually assented to, the complainants should not be held to be concluded from setting up the existence of a different boundary to one of these tracts and thus depriving the defendants of the principal benefit of the transaction. But however this may be, it is very plain that no such equity can be derived from such an affair as will entitle the complainants to an injunction. And, as it seems to me, these are the facts of the case, upon which my decision on this head must rest, for I do not see anything in the proofs which can be said to shake the affidavit of Mr. Brisbin. If that statement were false in any particular it would have been easy to show it to be so, but Mr. Rucker, the agent of the complainants, was not examined, and although Mr. Gould was called as a witness, his attention was not directed to this point; the only attempt to explain this affair is made in the answer of the complainants put in to the crossbill of the defendants, but which is under the corporate seal, and not being verified by oath, cannot have any decisive effect. Nor can I think the attempt which is made in this answer to get rid of the equitable circumstances contained in the affidavit of Mr. Rucker, a happy one. It consists in an averment that the only application which was made to the president of the Erie Company was " to purchase a certain specified tract of land; that nothing was said about its being for the purpose of connecting said branch railroad with the right of way of the main line of the Morris and Essex Railroad;" that "the objects and purposes for which it was to be used were not stated, and the president of the company, to whom the application was made, at the time, before he conveyed the same, examined the description and ascertained that its conveyance would not give any connection, and it was only after ascertaining that fact, and with that knowledge, that he made the conveyance; that he did

not intend to give any right of way so as to make said connection, and if said description at that time, would have been such as to have enabled the complainants to have made any connection between the Boonton branch and the Morris and Essex Railroad, he would then have refused to have made such connection." Now it is obvious that this plea, if useful for any purpose, has, at all events, this defect, that it tends to establish, not an equitable, but a legal defence. The answer does not deny that Mr. Gould was fully aware that the defendants believed that the deed was to have the opposite effect from that which he knew it would have; nor does it deny that he also knew that the purchase was made for the purpose of making a connection between the branch and main roads; what is denied is, that he was not informed of these things in express terms. It should be borne in mind that this is the answer of the corporation, and not that of Mr. Gould, and it may be that this transaction is susceptible of assuming a different complexion. But as the transaction is here detailed, it is clearly the case of one party allowing another to deceive himself, and gaining an advantage in consequence of such self-deception—a wrong sometimes irremediable at law, but which has heretofore, I think, never been presented to a court of equity as a ground for its assistance. A court of conscience regards a contract according to the principles of morals, and will expound and enforce it whenever practicable, in the sense in which the one party knew the other entered into it; and to the eye of such a court there is but a small difference between a false representation expressly made, and a representation which it is evident will be naturally implied from the circumstances of the case. If the Erie Company, through its officers, had assured the defendants at the time of the purchase, that the land to be conveyed extended to the land occupied by their railroad, the deception, if the fact were otherwise, would have been manifest, and no one would pretend that such a transaction could stand; and yet it appears to me the shade of distinction is quite obscure

between such conduct and the act of standing silent, with a knowledge that the force of the surrounding circumstances, unless counteracted, will have the same effect, and will tacitly introduce the same false suggestions. But it is especially certain that this tribunal will never lend its active aid to a party, who, by a superior knowledge and artful silence, has gained an unfair advantage over another. Such triumphs are deemed unconscionable, and are opposed to the general principles of the law.

Upon these various grounds my conclusion is, that the application for an injunction in this bill must be denied, and the order heretofore made must be dissolved.